UNITED STATES DISTRICT COURT                               **C/M**
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                            :
GARY M. GLESSING,                      :
                                            :    **MEMORANDUM DECISION**
                        Plaintiff,        :    **AND ORDER**
                                              :
            - against -               :    19-cv-5704 (BMC)
                                              :
COMMISSIONER OF SOCIAL        :
SECURITY,                                 :
                                              :
                        Defendant.       :
                                              :
-------------------------------------------------------- X

**COGAN**, District Judge.

       Plaintiff *pro se* Gary M. Glessing seeks review of the Commissioner of Social Security's

decision that he is not entitled to disability insurance benefits under the Social Security Act.

This case is now in its tenth year. Plaintiff applied in 2011, citing impairments in his left knee.

When an Administrative Law Judge determined that plaintiff was not disabled, this Court

identified several errors, and the case was remanded for further proceedings. See Glessing v.

Comm'r of Soc. Sec., No. 13-cv-1254, 2014 WL 1599944, at *14 (E.D.N.Y. Apr. 21, 2014). An

ALJ again determined that plaintiff was not disabled. Although this Court upheld that decision,

the Second Circuit vacated the judgment in part, and the case was remanded once again. See

Glessing v. Comm'r of Soc. Sec., No. 16-cv-2010, 2017 WL 27952, at *3 (E.D.N.Y. Jan. 3,

2017), aff'd in part, vacated in part, 725 F. App'x 48 (2d Cir. 2018). A third ALJ has now

concurred with his predecessors.

       That ALJ found that plaintiff suffered from post-traumatic synovitis, torn meniscus, torn

anterior cruciate ligament ("ACL"), and status post-ACL reconstruction and grade III

chondromalacia of the patella of the left knee. Yet the ALJ found that plaintiff had the residual

functional capacity to perform sedentary work with the following limitations: never operating

foot controls with the left foot; no more than occasionally climbing or using ramps; never

climbing ladders, ropes, or scaffolds; no more than occasionally balancing or stooping; never

kneeling, crouching, or crawling; and never being exposed to unprotected heights.  The ALJ thus

determined that plaintiff could perform his past relevant work as a security guard and, in the

alternative, that plaintiff could perform other jobs that existed in significant numbers in the

national economy.

Although the evidence is not one-sided, the deferential standard of review requires me to

uphold the ALJ's alternative finding.  Specifically, I conclude that substantial evidence supports

the ALJ's finding that plaintiff could perform certain forms of sedentary work that exist in

significant numbers in the national economy.  The Commissioner's motion for judgment on the

pleadings is granted.

## BACKGROUND

### I.       Treatment Before the Alleged Onset Date

Plaintiff maintains that he is disabled due to several impairments of his left knee, with an

onset date of June 14, 2006.  These knee problems stem from several injuries he sustained during

his fourteen-year career with the New York City Police Department.  According to police

records, they began in 1989 when plaintiff tore ligaments in his left knee while playing

volleyball.  He suffered at least four more injuries – including a torn anterior cruciate ligament

("ACL") – in the line of duty over the next few years.

In March 1995, plaintiff underwent an orthopedic consultation and examination with Dr.

Stuart Springer, M.D.  Based on a physical examination and an MRI, Dr. Springer identified a

tear of the medial meniscus.  He opined that plaintiff needed an operative arthroscopy to

"delineate the exact intra-articular pathology and institute appropriate surgical management."

After performing that procedure, Dr. Springer noted that plaintiff had a "displaced bucket handle tear of the medial meniscus with an anteriorly based flap with the bulk of the anterior cruciate ligament dislocated within the medial gutter." He also noted "an old anterior cruciate ligament tear with only minimal fibers remaining in the posterior aspect of the intercondylar region." Dr. Springer reported to the NYPD that plaintiff should "undergo an intensive program of rehabilitation and physical therapy to regain full strength of the left lower extremity" and would need to "be carefully reevaluated" to see if his ACL required reconstructive surgery.

A June 1995 police record shows that plaintiff was then placed on limited duty. Plaintiff was not approved to operate police vehicles, and he needed "limited use" of the legs. He also needed a limited amount of stair-climbing, but the record indicates that plaintiff did not need any limitations for standing, walking, or "laborious work."

A few months later, in August 1995, Dr. Springer performed reconstructive surgery on plaintiff's ACL. He then instructed plaintiff to undergo "an intensive program of rehabilitation and physical therapy." Dr. Springer estimated that the recovery would take four months. It ended up taking far longer. By October, plaintiff returned to restrictive duty. And by August 1996, a full year after the reconstructive surgery, plaintiff reported to Dr. Springer that a police surgeon had cleared him to return to full duty.

At a follow-up visit with Dr. Springer, plaintiff stated that he did not feel ready to perform his full duties as a police officer. Plaintiff reported that he was "still having significant problems with his left knee, feeling a bone-on-bone sensation on the medial side and numbness along the medial aspect of the left tibia, consistent clicking with extension, achiness medially in the jointline, and . . . a lack of strength." Dr. Springer conducted an examination, and he recommended that plaintiff "continue to do a good course of physical therapy to try to restore

full strength." And based on plaintiff's complaints and symptomatology, Dr. Springer opined

that "it is possible that [plaintiff] may not be able to perform full duties as a New York City

Police Officer."

Meanwhile, plaintiff occasionally saw an NYPD orthopedist, Dr. Goldman. In August

1996, Dr. Goldman noted that plaintiff could "almost do [a] full hop" and squat. He

recommended physical therapy. By October 1996, plaintiff continued to report pain on the job.

Dr. Goldman's examination revealed a good range of motion but approximately 1.5 to 2

centimeters of atrophy in the quadriceps and calf muscles. He cleared plaintiff for limited duty,

but he suggested that plaintiff do a trial of full duty after three to four weeks of physical therapy.

At a follow-up appointment in November, Dr. Goldman noted "significant" atrophy of 2.5 to 3

centimeters and noted that plaintiff could not do a full squat, duck walk, or deep knee bend. Dr.

Goldman then observed that plaintiff had increased instability and crepitus compared to his last

several visits. Given this condition, he agreed with Dr. Springer's September 1996 assessment,

which had floated the possibility of plaintiff not being able to return to active duty. Dr. Goldman

stated that he could not recommend plaintiff for full duty, given the increased instability,

crepitus, and weakness relative to prior exams. A police report then stated that plaintiff should

have limited use of the legs and limited stair-climbing.

Plaintiff returned to Dr. Springer in January 1997. He reported that plaintiff continued to

have problems with soreness, for plaintiff "fe[lt] that his bones [were] knocking together."

Plaintiff also reported numbness and soreness. Dr. Springer reported 2.5 centimeters of atrophy

but no crepitation. He again recommended physical therapy. "Based on the slowness of

[plaintiff's] recovery and the symptomology that [plaintiff was] describing," Dr. Springer opined

that plaintiff would not be able to return to full duty.

The physical therapist then reported that plaintiff was "working the evening shift on light duty." Plaintiff reported "pain with prolonged standing in the left knee, as he ha[d] in the past." Although plaintiff did have "some atrophy," he had a full range of motion, pain free. Physical therapy would consist of "the use of modalities of moist heat, electrical stimulation for muscle re-education to the left [vastus medialis oblique], as well as active therapeutic exercise to strengthen the entire extremity, improve gait, and work on balance and proprioception."

Plaintiff then returned to Dr. Springer in May 1997, reporting the same complaint of "bones banging into each other" while walking. Dr. Springer posited that "[t]his may occur because [plaintiff] had a bucket handle tear of the medial meniscus and lost most of it at the other surgery." He noted the same problems with atrophy. His "feeling" was that plaintiff would need "continued physical therapy," and he recommended use of a lateral heel wedge and a knee brace. He also stated that plaintiff would need a wheelchair "in some instances" such as prolonged walking.

Plaintiff continued physical therapy. In an August 1997 progress report, plaintiff's physical therapist stated that plaintiff had "progressed to a strenuous therapeutic exercise program which include[d] the use of weight training, cardiovascular endurance, the use of a stepper, as well as functional closed kinetic chain activities." Plaintiff performed these exercises for 30 to 45 minutes each session. Police records also show that plaintiff received electrical stimulation and ice massages, was exercising using a NordicTrack, and used a neoprene knee support when walking. He also complained of pain while ascending and descending stairs.

In September 1997, an NYPD surgeon recommended that a survey be conducted to determine whether plaintiff was "incapacitated for the performance of duty and ought to be retired." As that process bore out, plaintiff returned to Dr. Springer, again reporting "a bone on

bone sensation." He had not returned to full strength. Dr. Springer opined that plaintiff was "probably feeling the loss of the medial meniscus, hence the bone on bone clunking." Based on the examination, Dr. Springer concluded that plaintiff's "condition [was] permanent and restricted duty would also have to be of a permanent nature."

At the next visit, Dr. Springer noted "no significant improvement." Although plaintiff still had muscle atrophy, he had a "very good range of motion." Dr. Springer also noted that plaintiff was "quite stable so the cruciate ligament reconstruction ha[d] worked well." Plaintiff "ha[d] probably reached maximum benefits from surgery," though "a continued program of physical therapy would be helpful." Dr. Springer opined that plaintiff would "not be able to return to full duties" and "should be considered to have a permanent partial disability."

In January 1998, an NYPD medical board examined plaintiff to determine if he was capable of performing full police duties. Plaintiff "was ambulatory with a methodic gait and a mild limp." There was atrophy but a "satisfactory" range of motion and no significant crepitus. But based upon their review of the records, history, and clinical findings, the medical board "felt that there were significant objective findings with evidence of instability of the knee." The diagnosis was post-traumatic synovitis, torn medial meniscus, torn ACL, status post ACL reconstruction, and Grade III chondromalacia of the patella, left knee. The medical board thus recommended accident disability retirement. Plaintiff retired a few months later, in June 1998.

After being out of work for three years, plaintiff took a job as a museum security guard. Plaintiff worked the midnight shift. He describes his responsibilities as "basically to sit in the lobby, in a cushion[ed], reclined round chair with [his] leg elevated." Although he could not patrol the building or pursue possible intruders, he got the job because the museum needed an armed guard present at every hour of the day for insurance purposes. Five years in, however, the

museum downsized from six guards to two, and plaintiff could not perform the work that the museum required.

Plaintiff left the job on June 14, 2006, the alleged onset date of disability.  He did not seek any treatments between that date and the date last insured, March 31, 2012.

## II.   The First Decision and the Treatment After the Date Last Insured

Plaintiff applied for benefits in 2011.  The Social Security Administration's Cooperative Disability Investigation Unit launched an investigation.  The investigators observed plaintiff at his residence, reporting that he walked around his lawn.  At times, plaintiff displayed a limp, but at other times, plaintiff appeared to have no limp.  The investigators also reported that plaintiff "hopped down a step with what appeared to be fluid movements."  They observed plaintiff as he went to the store, and plaintiff was walking "at a quick pace" with no knee brace and "no indication he was experiencing any physical pain or other discomfort."

That same day, plaintiff saw a consultative examiner, Dr. Mahendra Misra.  He reviewed parts of plaintiff's medical history and conducted the examination.  He observed that plaintiff walked heel-to-toe but with a limping gate.  Plaintiff "was unable to do heel walking, toe walking, or any squatting," but he could get on and off of the examination table by himself.  Dr. Misra diagnosed plaintiff with "[s]tatus post left knee surgery for torn meniscus as well as torn ACL/persistent internal derangement."  He then opined that plaintiff would "not be able to do jobs which require prolonged standing, walking, climbing, running, lifting, pulling, or pushing."

The ALJ ultimately gave this opinion "little weight."  In the ALJ's view, the opinion was not relevant to plaintiff's condition during the relevant period because it was partially based on fifteen-year-old reports.  In any event, the ALJ continued, Dr. Misra's examination showed that plaintiff's knee was "completely normal."  The ALJ thus found that plaintiff had the residual functional capacity to perform "light work" – namely, lifting and carrying up to 20 pounds

occasionally and ten pounds frequently, standing or walking for approximately six hours out of an eight-hour workday with normal breaks, and sitting for approximately six hours out of an eight-hour workday with normal breaks.

After the ALJ issued that decision, plaintiff submitted additional evidence to the Appeals Council. It consisted of treatment notes from Dr. Springer. Plaintiff had returned for a physical examination in April 2012. Dr. Springer noted "exquisite tenderness along the anteromedial joint line" but "good ligamentous stability." A scan revealed "minimal degenerative changes." Dr. Springer once again recommended physical therapy and an arthroscopic surgical exploration of the knee. Dr. Springer performed that procedure a month later. He found recurrent tears on the medial and lateral menisci, grade III and IV chondromalacia of the medial femoral condyle, and grade III chondromalacia of the patella and trochlea. The ACL reconstructive surgery had provided good stability. Dr. Springer eventually recommended an "aggressive program of physical therapy" and use of a lateral heel wedge.

Dr. Springer also opined that "[t]his case represents a gradual deterioration over the years from [plaintiff's] original major surgical time of 1995 through the current 2012 and the worsening clinical condition of his knee." The most recent surgery, he explained, was "designed to slow down the current significant degenerative changes." And based on the degeneration of plaintiff's knee and the grade III and IV chondromalacia, Dr. Springer opined with a reasonable degree of medical certainty that plaintiff's condition "would have already been significantly progressed before January 2011."

Dr. Springer referred plaintiff to Dr. Perry Drucker for rehabilitative and physical therapy. Dr. Drucker evaluated plaintiff several times over the next two years. In the initial visit, plaintiff reported "isolated post-op episodes of left knee buckling" but denied "any left

knee locking." Plaintiff also reported pain with prolonged standing and walking, as well as "moderate difficulty with sitting greater than 30-40 minutes, secondary to his knee being bent and needs to change position." Dr. Drucker's impression was status-post left knee arthroscopic partial medial and lateral meniscectomies and secondary chondromalacia patellae. He put plaintiff on a physical therapy regimen. At follow-up appointments, plaintiff still reported difficulty with sitting with his knee flexed for greater than 30 to 40 minutes, and Dr. Drucker continued to recommend physical therapy. A year in, Dr. Drucker noted that plaintiff was a "candidate for total knee replacement down the road."

In 2013, Dr. Drucker and Dr. Springer signed identical forms stating that plaintiff was "permanently and totally disabled." Plaintiff also continued to see Dr. Springer. He performed injections to treat plaintiff's plain. By late 2013, he noted "no significant interval change in reference to [plaintiff's] left knee with normal symptoms of posttraumatic degenerative changes."

In 2014, this Court reviewed the ALJ's decision that plaintiff could perform light work. The Court found it "fundamentally flawed." Glessing, 2014 WL 1599944, at *10. Neither Dr. Misra's opinion nor any other medical opinion supported the finding, so the ALJ had "arbitrarily substitute[d] his own judgment for competent medical opinion." Id. (quotation omitted). The case was remanded for another hearing.

## III.    The Second Decision and Plaintiff's Continued Treatment

In 2014, plaintiff visited a second consultative examiner, Dr. Sujit Chakrabarti. Like Dr. Misra, Dr. Chakrabarti reviewed aspects of plaintiff's medical history and performed an examination. He observed that plaintiff limped favoring his left side, was unable to squat due to knee pain, and complained of crepitation in the left leg during flexion and extension movements. Dr. Chakrabarti's "impression" was "status post surgery of the left knee and possible arthritic

9

changes in the left knee."  In a medical source statement, Dr. Chakrabarti opined that plaintiff could only occasionally lift and carry up to 10 pounds or operate foot controls with his left foot. Plaintiff should never kneel, crawl, climb ladders or scaffolds.  He could stand for only 20 minutes a time and up to two hours in an eight-hour workday, and he could walk for only 30 minutes at a time and up to one hour in an eight-hour workday.  Most relevantly, plaintiff could sit for only two hours at a time and only four hours in an eight-hour workday.

After reviewing this medical source statement alongside the other evidence in the record, a second ALJ determined that plaintiff could perform sedentary work with certain limitations. The ALJ then determined that plaintiff was capable of performing his past relevant work as a "desk officer."  The ALJ cited no other work that plaintiff could perform.

Although this Court upheld the ALJ's decision, the Second Circuit concluded that he erred in finding that plaintiff actually worked as a desk officer.  Glessing, 725 F. App'x at 49.  In remanding for another hearing, the Circuit cautioned that "further development of the record may support a finding of non-disability on other grounds" – including a finding that plaintiff could perform other work available in the national economy.  Id. at 51.  The Court then stated that plaintiff's remaining arguments were without merit.

## IV.    The Third Decision

At the third hearing, plaintiff testified regarding his job as a security guard.  No vocational expert was present for plaintiff to examine.  After that hearing, however, the third ALJ wrote to plaintiff indicating that he planned to enter into the record two new sources of evidence – one concerning a vocational expert and one concerning a medical expert, Dr. Sonya Clark.

In response to interrogatories, the vocational expert stated that the job of a security guard was generally performed as light work but that plaintiff had actually performed it as sedentary

work.  The vocational expert added, in response to a hypothetical, that a person with plaintiff's residual functional capacity and limitations could perform the job of security guard as plaintiff actually performed it.  He added that the person could also perform the sedentary jobs of "table worker," "addresser," and "lens inserter."

The ALJ issued two sets of interrogatories to Dr. Clark.  She opined that, "[f]or the entire period of review," plaintiff showed decreased abilities in walking, standing, stooping, climbing, crawling, and crouching.  In a medical source statement, she added that plaintiff could frequently lift and carry up to 10 pounds and could occasionally lift and carry up to 20 pounds.  She also opined that plaintiff could stand and walk for only one hour at a time, as well as only one hour out of an eight-hour workday.  Although plaintiff could sit for only one hour without interruption, he could sit for the full eight hours of the workday.

At plaintiff's request, the ALJ held a second hearing, where plaintiff cross-examined the vocational expert.  Plaintiff noted that he performed his job as a security guard with his leg elevated.  The vocational expert stated that a person with that limitation would not be able to perform sedentary work.

 The ALJ eventually determined that, despite plaintiff's severe impairments, he had the residual functional capacity to perform sedentary work with a few limitations, none of which involved sitting.  The ALJ assigned "significant weight" to Dr. Misra's opinion, reasoning that the absence of a limitation on sitting was "supported by [plaintiff's] own self-report at the time." However, the ALJ gave "little weight" to Dr. Chakrabarti's opinion that plaintiff could sit for only four hours a day, for Dr. Chakrabarti had rendered the opinion after the last date insured. Next, the ALJ gave only "partial weight" to Dr. Clark's opinion because she did not offer detailed explanations for several of her conclusions.  The ALJ instead gave plaintiff "the benefit

of the doubt" and "considered his subjective symptoms in formulating a residual functional capacity where [he] can only perform less than sedentary work."  Given that residual functional capacity, the ALJ reasoned, plaintiff could perform his past relevant work as a security guard in the sedentary manner that he actually performed it.  Alternatively, the ALJ found that plaintiff could perform other jobs available in the national economy.

## DISCUSSION

### I.      Legal Framework

In reviewing the Commissioner's decisions, courts are "limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (cleaned up).  The court must "conduct a plenary review of the administrative record," including "contradictory evidence and evidence from which conflicting inferences can be drawn."  Id. (quotation omitted).  In this case, plaintiff raises several points of error, and I address each in turn.

### II.     The Listing of Impairments

First, plaintiff argues that his condition meets one of the listing of impairments – i.e., the "list of physical and mental impairments which, if met, are conclusive on the issue of disability." Kaur v. Comm'r of Soc. Sec., No. 19-cv-4130, 2021 WL 216070, at *1 (E.D.N.Y. Jan. 21, 2021) (quotation omitted).  Specifically, plaintiff points to Listing 1.03, which covers "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively . . . and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.03.  That same section defines the "inability to ambulate effectively" as follows:

> Definition. Inability to ambulate effectively means an extreme limitation of the
> ability to walk; i.e., an impairment(s) that interferes very seriously with the
> individual's ability to independently initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as having insufficient lower extremity
> functioning . . . to permit independent ambulation without the use of a hand-held
> assistive device(s) that limits the functioning of both upper extremities.

Id. § 1.00B2b(1). Here, the record lacks evidence that plaintiff has an "extreme limitation" in his

ability to walk. Therefore, substantial evidence supports the ALJ's finding that plaintiff did not

meet any of the listing of impairments.

**III.    Past Relevant Work**

Plaintiff next challenges the ALJ's finding that he could perform his past work as a

security guard. "Past relevant work" is "work that [a claimant] ha[s] done within the past 15

years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn

to do it." 20 C.F.R. § 404.1560(b)(1). The claimant "has the burden to show an inability to

return to her previous specific job and an inability to perform her past relevant work generally."

Albano v. Colvin, 99 F. Supp. 3d 355, 367–68 (E.D.N.Y. 2015) (quotation omitted). As the

Second Circuit has already explained in this case, an ALJ must conduct "separate evaluations of

the previous specific job and the job as it is generally performed." Glessing, 725 F. App'x at 49.

The Dictionary of Occupational Titles "is used to evaluate jobs as they are generally

performed." Albano, 99 F. Supp. 3d at 368 (quotation omitted). That source explains that the

occupation of "security guard" generally entails "light" work in the national economy. See

DICOT 372.667-034, 1991 WL 673100. Plaintiff thus could not perform the work of a security

guard as it is generally performed in the national economy, as his residual functional capacity

limited him to sedentary work.

The ALJ thus stated that plaintiff could perform the work of a security guard as he

actually performed it. The ALJ cited the vocational expert's interrogatory responses and

testimony at the supplemental hearing.  The ALJ thus found that plaintiff had the residual

functional capacity to perform past relevant work.

    As the Second Circuit noted in this case, however, "prior employment only qualifies as

'past relevant work' if it is 'substantial gainful activity,'" and "[p]rior employment may or may

not be substantial gainful activity if it is performed under 'special conditions.'"  Glessing, 725 F.

App'x at 51 (quoting 20 C.F.R. §§ 404.1560(b)(1), 404.1573(c)).  The regulations explain:

> If your work is done under special conditions, we may find that it does not show
> that you have the ability to do substantial gainful activity.  Also, if you are forced
> to stop or reduce your work because of the removal of special conditions that
> were related to your impairment and essential to your work, we may find that
> your work does not show that you are able to do substantial gainful activity.
> However, work done under special conditions may show that you have the
> necessary skills and ability to work at the substantial gainful activity level.
> Examples of the special conditions that may relate to your impairment include,
> but are not limited to, situations in which –
>
> (1) You required and received special assistance from other employees in
> performing your work;
>
> (2) You were allowed to work irregular hours or take frequent rest periods;
>
> (3) You were provided with special equipment or were assigned work especially
> suited to your impairment;
>
> (4) You were able to work only because of specially arranged circumstances, for
> example, other persons helped you prepare for or get to and from your work;
>
> (5) You were permitted to work at a lower standard of productivity or efficiency
> than other employees; or
>
> (6) You were given the opportunity to work despite your impairment because of
> family relationship, past association with your employer, or your employer's
> concern for your welfare.

20 C.F.R. § 404.1573(c).

    The record shows that plaintiff performed his work under special conditions.  At multiple

hearings, plaintiff testified that his job consisted of sitting in a cushioned chair with his leg

elevated.  If an intruder had appeared, he would have had to call 911 rather than pursuing the

intruder himself.  Basically, his job was to be present with a firearm for insurance purposes.  The ALJ never questioned the credibility of this assertion in his decision.  In addition, the vocational expert testified that if a person had to elevate his leg for 50 percent of the workday, that person could not perform "any" sedentary job.  It follows that plaintiff performed his work as a security guard under "special conditions."

The circumstances of his departure from the job bolster that conclusion.  At his second hearing, in 2014, plaintiff testified that he left his job when his employer downsized from six to two guards per shift.  Plaintiff explained that "they were requiring the two of us to do the job that once six did," which meant that plaintiff had to start climbing staircases and patrolling the building.  Plaintiff could not keep up, and he eventually left the job.[1]  Thus, plaintiff was, at least in part, "forced to stop or reduce [his] work because of the removal of special conditions that were related to [his] impairment and essential to [his] work."  20 C.F.R. § 404.1573(c).

The ALJ erred in failing to examine these facts.  Nor can the Commissioner claim to be caught unawares, for the Second Circuit explicitly warned about this possibility.  "Even if the [second] ALJ had analyzed [plaintiff's] past work as [plaintiff] himself had performed it," the Circuit cautioned, "the ALJ did not determine whether this work was substantial gainful activity in light of the special conditions under which it was performed."  Glessing, 725 F. App'x at 51 (citing Smith v. Colvin, No. 14-cv-3923, 2016 WL 374136, at *8 (N.D. Ill. Feb. 1, 2016); then citing Jones v. Astrue, No. 12-cv-2125, 2013 WL 4522045, at *3–4 (D. Colo. Aug. 27, 2013)). Likewise, other courts have stated that "[w]here there is evidence that a position to which [the plaintiff] has been found capable of returning may have been performed under 'special

---

[1] The other contributing factors are not entirely clear from plaintiff's testimony, but the increased responsibility was a significant reason for plaintiff's departure.

conditions,' the ALJ has a duty to develop the record before him in order to adequately address the issue in his decision." Jones, 2013 WL 4522045, at *4.

Here, therefore, the ALJ erred by failing to address the possibility of special conditions. See Smith, 2016 WL 374136, at *8 (holding that an ALJ erred in failing to account for a plaintiff's testimony regarding an accommodation at his prior job). I thus conclude that substantial evidence does not support the ALJ's determination that plaintiff had the residual functional capacity to perform his past relevant work.

## IV.   The ALJ's Alternative Finding

My conclusion above means that if the Commissioner's decision is to survive substantial evidence review, it must do so on the ALJ's alternative finding – that plaintiff had the residual functional capacity to perform other sedentary work available in the national economy. Based on the vocational expert's testimony and interrogatory responses, the ALJ determined that a person with plaintiff's residual functional capacity and limitations could work as a "table worker," "addresser," or "lens inserter." Plaintiff claims error in both the assessment of his residual functional capacity and the assessment of the jobs in the national economy.

### A.   Residual Functional Capacity

Plaintiff contends that substantial evidence does not support the ALJ's finding that he could perform sedentary work. To that end, plaintiff emphasizes his testimony that he needed to elevate his leg when he worked as a security guard. Plaintiff also notes that the vocational expert testified that a person who needed to elevate a leg for more than 50 percent of the day could not perform "any" sedentary work. Thus, says plaintiff, substantial evidence does not support the ALJ's findings regarding his residual functional capacity.

Although the ALJ did not specifically state that plaintiff had the residual functional capacity to perform sedentary work without elevating his leg for a significant portion of the day,

that finding is implicit in the ALJ's decision.  It named several limitations on plaintiff's residual

functional capacity, but none involved sitting.  The ALJ also found that plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged symptoms, but

plaintiff's statements concerning the intensity, persistence, and limiting effects of those

symptoms were not consistent with the evidence in the record.  Substantial evidence supports

those findings.  Other than plaintiff's testimony at the hearing, there is no evidence that plaintiff

needed to keep his leg elevated.

Substantial evidence also supports the ALJ's more general finding that plaintiff could

perform sedentary work with only the listed limitations.  The social security regulations define

"sedentary" work as follows:

> Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a
> time and occasionally lifting or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as one which involves sitting, a
> certain amount of walking and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are required occasionally and
> other sedentary criteria are met.

20 C.F.R. § 404.1567(a).  Plaintiff does not dispute that he can lift more than 10 pounds at a

time, so the question is whether plaintiff can fulfill the sitting requirements for sedentary work.

"[T]he Commissioner recognizes that for sedentary work, 'sitting would generally total about 6

hours of an 8-hour workday." Lane v. Astrue, 267 F.R.D. 76, 85 (W.D.N.Y. 2010) (alteration

adopted) (quoting SSR 96-9p, 1996 WL 374185 at *3 (1996)).

To show that he cannot meet this requirement, plaintiff points to Dr. Chakrabarti's

opinion, but the ALJ did not err in giving this opinion "little weight."  Although Dr. Chakrabarti

opined that plaintiff could sit for only two hours without interruption and for only four hours

within an eight-hour workday, Dr. Chakrabarti's own evaluation does not adequately support

those conclusions.  Dr. Chakrabarti relied in part on plaintiff's medical history, but no part of

that history suggests that plaintiff has severe limitations in his ability to sit.  Although Dr.

Drucker noted plaintiff's subjective complaints that he had difficulty sitting with his knee flexed

for greater than 30 to 40 minutes, neither Dr. Drucker nor Dr. Springer noted any objective

findings that would confirm that report.  The police records also lack evidence of such a

problem.

That leaves Dr. Chakrabarti's own examination, but that, too, fails to support his

conclusion.  Dr. Chakrabarti reported that plaintiff "limp[ed] favoring his left side," had "some

impaired sensation in his left leg," and "complain[ed] of some crepitation felt in the left leg

during flexion and extension movements."  These assessments could undercut a finding that

plaintiff cannot perform "light" work, but they do not suggest that plaintiff can sit for only four

hours in an eight-hour workday.

The other evidence in the record confirms that conclusion.  Regardless of whether Dr.

Springer qualifies as plaintiff's "treating physician," he never provided an opinion or treatment

notes suggesting that plaintiff could sit for only four hours a day.  Neither did Dr. Goldman, nor

Dr. Drucker.  And the lone examination from the relevant period, from Dr. Misra, did not

suggest that plaintiff cannot sit for the amount of time that sedentary work requires.

Although some evidence in the record suggests that plaintiff does have the limitations he

claims, that evidence is not fatal to the ALJ's decision.  Plaintiff first points to two IRS forms,

signed by Dr. Springer and Dr. Drucker in 2013, which "certif[ied]" that plaintiff "cannot engage

in any substantial gainful activity because of a physical or mental condition" that "has lasted or

can be expected to last continuously for at least a year."  Although the ALJ incorrectly stated that

the letters were from an "unnamed physician," the ALJ correctly noted that the disability

determination is reserved for the Commissioner and thus gave the opinions "little weight."  <u>See,</u>

e.g., Taylor v. Barnhart, 83 F. App'x 347, 349 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(e)(1))

(holding that a treating physician's opinion that a claimant was "temporarily totally disabled"

was not entitled to controlling weight "since the ultimate issue of disability is reserved for

the Commissioner").  Because IRS forms do not contain any other findings or medical opinions

that would indicate that plaintiff cannot sit for the amount of time that sedentary work requires,

the ALJ did not err in giving this evidence little weight.

Granted, Dr. Clark stated that plaintiff could sit for only one hour without interruption,

which in some circumstances can undermine a finding that a claimant can perform sedentary

work.  See Rosario v. Sullivan, 875 F. Supp. 142, 148 (E.D.N.Y. 1995); see also Polidoro v.

Apfel, No. 98-cv-2071, 1999 WL 203350, at *5 (S.D.N.Y. Apr. 12, 1999) (collecting cases to

show that "courts have found claimants disabled when they are unable to perform substantial

sitting over the course of a work day without alternating between sitting and standing").  But the

ALJ gave this opinion only "partial weight" because Dr. Clark did not explain several of her

seemingly inconsistent conclusions.  Therefore, the remainder of the record does not support a

conclusion that plaintiff can sit for only four hours a day.

In this regard, plaintiff relies on arguments that both this Court and the Second Circuit

have already rejected.  In his previous appeal, I noted that Dr. Chakrabarti's opinion regarding

plaintiff's ability to sit was "inconsistent with the results of his own examination of plaintiff,

which were generally normal and did not indicate significant weakness or atrophy."  Glessing,

2017 WL 27952, at *3.  Then, in his appeal to the Second Circuit, plaintiff argued that Dr.

Chakrabarti's opinion confirmed that he did not meet requirements for sedentary employment.

See Brief for Appellant at 15, 25, Glessing v. Comm'r of Soc. Sec., 725 F. App'x 48 (2d Cir.

2018) (No. 17-449).  The Second Circuit rejected all but one of plaintiff's arguments as "without

merit," and it explicitly left open whether an ALJ could find that plaintiff had the residual functional capacity to perform other jobs available in the national economy.  725 F. App'x at 51. Because there is no new evidence that would change the analysis of Dr. Chakrabarti's opinion, plaintiff's arguments must fail once again.

Conversely, the concerns that drove me to vacate the Commissioner's first decision are not present here.  There, I criticized the ALJ's decision not to reference Dr. Springer or any of his findings.  Although "Dr. Springer's reports were quite old by the time of plaintiff's hearing," I noted, "the only medical evidence in the record from plaintiff's alleged period of disability – the physical consultative examination conducted by Dr. Misra in June 2011 – produced similar findings."  Glessing, 2014 WL 1599944, at *9.  This was a problem because the first ALJ had found that plaintiff could perform "light" work and could stand or walk for six hours in an eight-hour workday.  Here, however, the ALJ found that plaintiff could perform only sedentary work, and none of Dr. Springer's notes or opinions detract from this conclusion.

Therefore, I conclude that substantial evidence supports the ALJ's finding that plaintiff retained the residual functional capacity to perform sedentary work with limitations that did not involve sitting.

**B.     Other Jobs in the National Economy**

Plaintiff also contends that the ALJ erred in finding that there were other jobs in the national economy that plaintiff could perform, given his age, education, work experience, and residual functional capacity.  The vocational expert cited jobs as a "table worker," "addresser," or "lens inserter."  Plaintiff zeroes in on the "lens inserter" job.  According to the Dictionary of Occupational Titles, a lens inserter "[f]its lenses into plastic sunglass frames and places frames on conveyor belt that passes under heat lamps which soften frames preparatory to setting of lenses."  DICOT 713.687-026, 1991 WL 679273.  Thus, says plaintiff, a lens inserter works in

the ophthalmic goods manufacturing industry.  Plaintiff then points to the Census Bureau's

County Business Patterns ("CBP"), of which the Social Security Administration will take

administrative notice.  20 C.F.R. § 416.966(d)(2).  According to plaintiff, the CBP provides that

the entire ophthalmic goods manufacturing industry accounts for 24,910 jobs, yet the vocational

expert testified that there were 25,729 lens inserter jobs in the national economy.  Given this

inconsistency, plaintiff argues, substantial evidence cannot support the ALJ's finding that he

could work as a lens inserter.[2]

      To be sure, the ALJ needed to identify what types of jobs plaintiff could perform and

whether those jobs "exist[ed] in significant numbers in the national economy."  20 CFR

§ 404.1560(c)(1).  But "[t]he term 'significant number' is not statutorily defined and courts have

generally found that what constitutes a 'significant' number is fairly minimal."  Rodriguez v.

Astrue, No. 11-cv-6977, 2013 WL 3753411, at *3 (S.D.N.Y. July 17, 2013) (cleaned up).  Courts

have also recognized that estimating the number of jobs in the national economy is not a precise

science, such that a certain degree of variation is to be expected.  See Poole v. Saul, 462 F. Supp.

3d 137, 165 (D. Conn. 2020) (holding that a vocational expert's testimony provided substantial

evidence for an ALJ's finding even though the vocational expert's numbers conflicted with those

from counsel's independent research).

      Here, the difference is relatively slight.  Plaintiff also failed to challenge the vocational

expert's numbers at the hearing, and in this situation, "a vocational expert's testimony may count

as substantial evidence even when unaccompanied by supporting data."  Biestek v. Berryhill, 139

S. Ct. 1148, 1155 (2019).  Finally, the alleged discrepancy does not affect the ALJ's finding on

---

[2] Although the Commissioner questions plaintiff's CBP figures, the accuracy of plaintiff's statement does not
determine this issue.  Plaintiff also states that the vocational expert testified that there were over 30,000 jobs as a
lens inserter in the national economy, but that figure reflects the vocational expert's calculations for addressers, not
lens inserters.

the remaining two jobs.  See, e.g., Williams v. Astrue, No. 12-cv-6175, 2013 WL 870649, at *12 (W.D.N.Y. March 7, 2013) (holding that "the listing of only one vocation . . . was sufficient to carry the Commissioner's burden to show that other work existed that [the plaintiff] could perform").

Therefore, substantial evidence supports the ALJ's determination that plaintiff could perform other jobs that existed in significant numbers in the national economy.

### C.     Due Process

Finally, plaintiff argues that the ALJ violated his due process rights because he did not have an opportunity to cross-examine Dr. Clark.  The Second Circuit has identified a due process violation where an ALJ relied upon a post-hearing vocational report but denied the plaintiff's request for an additional hearing to cross-examine the report's author.  See Townley v. Heckler, 748 F.2d 109, 114 (2d Cir. 1984).  But the due process analysis is highly fact-dependent – the Social Security Administration does not violate a plaintiff's due process rights whenever an ALJ relies upon a report and the plaintiff fails to cross-examine the author.  See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998) (holding that "the right to due process in a social security disability hearing does not require that a reporting physician be subpoenaed any time a claimant makes such a request").  The facts of this case show that the Social Security Administration did not violate plaintiff's due process rights.

After the first hearing, the ALJ gave plaintiff notice that he planned to enter into the record Dr. Clark and the vocational expert's interrogatory responses.  The notice stated that plaintiff could (1) submit written comments concerning the evidence, a written statement as to the facts and law he believed applied to the case in light of that evidence, and any other evidence he wished the ALJ to consider; (2) submit written questions to be sent to the authors; or (3) request a supplemental hearing.  "If you request a supplemental hearing," the letter

continued, "I may grant the request.  In addition, you may request an opportunity to question witnesses, including the author(s) of the new evidence.  I will grant a request to question a witness if I determine that questioning the witness is needed to inquire fully into the issues."  In response, plaintiff requested a supplemental hearing and asked to cross-examine the vocational expert, but plaintiff did not ask to cross-examine Dr. Clark.  In these circumstances, I conclude that plaintiff's due process rights were not violated.

## CONCLUSION

The Commissioner's motion for judgment on the pleadings [11] is granted.  The Clerk is directed to enter judgment, dismissing the case.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
                              U.S.D.J.

Dated:  Brooklyn, New York
        April 13, 2021